Tueley, J.
delivered the opinion of the court.
At the October term, 1S42, of the Circuit Court for the county of Lauderdale, the following order appears of record:
“Upon motion • of the Attorney General, it appearing to the satisfaction of the court, that there is reasonable cause to suspect that John Simpson and James Albrington have, been guilty of larceny, and that no person will prosecute for said offence; it is therefore ordered by the court, that the Attorney General file a bill of indictment ex. officio.”
Under this order a bill of indictment was accordingly filed, without a prosecutor, against John Simpson and James Al-brington, for the offence of grand larceny. On this bill of indictment the prisoner was put upon his trial at the June term, 1843, of said court, and convicted, and sentenced to confinement in the jail and penitentiary of the State for the period of five years; from which judgment he prosecutes an appeal, in the nature of a writ of error, to this court.
Upon the trial, it appeared that the prisoner and James Al-brington came on shore from the steamboat Gloster, at Jackson wood-yard, in the county of Lauderdale, State of Tennessee, with the property described in the bill of indictment in their possession; that, upon being arrested and confronted with E. S. Burr, the prisoner acknowledged that the property was Burr’s, and that he and Albrington, with the assistance of the Steward, had taken the same from the steamboat. The proof *457 of their guilt, independent of their confession, is ample and complete.
Several causes of error are now assigned and pressed upon the court, as reasons for a reversal of the judgment of the court'below.
1st. It is argued, that the order of the court under which the bill of indictment was filed, is informal and insufficient in this, that it does not show that witnesses were examined by the Judge before the order was made relative to the offence, without which the order could not be legally made.
The act of 1801, chap. 30, prohibits the filing of bills of indictment without a prosecutor marked thereon; and if it be done, authorizes the prisoner to give the act in evidence, and makes it the duty of the court to discharge him. This is the general law upon the subject; and if a bill of indictment be filed without a prosecutor to sustain it, it must be shown to be an exception from this general rule, created by statute subsequently passed.
Many such have been enacted, with most of which we have nothing to do in this particular case.
The act óf1822, ch. 40, sec. 3, authorizes the Circuit Judge to direct a prosecution ex officio by the Attorney General, without a prosecutor, whenever it may appear that there is reasonable ground for believing that an indictable offence has been committed, and no person will prosecute in behalf of the State. The act of 1842, chap. 65, limits the exercise of this discretion to cases in which the Judge may be satisfied from the examination of witnesses in open court, that a reasonable ground for such belief exists; and it is under the provisions of this statute that it is contended that the order ' directing the prosecution should have shown that proof was heard before it was made.
This statute prescribes the duty of the Circuit Judge upon this subject, and the legal presumption, in the absence of proof to the contrary, is, that it has been legally discharged. We cannot presume that a Circuit Judge has acted in disobedience to an express legislative command, and we cannot require him to show by his records, that he has not violated the law, in his orders preparatory to the commencement and prosecution of *458 suits-, either on the part of the State or individuals, involving-matters of controversy over which he has a general and unlimited jurisdiction; it is sufficient if the contrary does not appear.
2d. It is contended that the confessions of the prisoner should have been excluded from the jury, as having been illegally obtained, through his personal fears, superinduced by threats of violence on the part of those who had arrested him.
It does not appear that the prisoner’s confession of guilt was thus procured; it was made without threats, and before there ■were any insinuations that violence might be resorted to, to enforce a further confession and discovery relative to some paper money taken with other articles, and not found upon the prisoner, and not accounted for by him. This additional confession and discovery were, however, not obtained, and so the confession as made is good.
But it may be also observed, that, inasmuch as there is ample proof of the prisoner’s guilt, independent of his confession, if there were doubt as to the manner in which it was obtained, we would not reverse therefor.
3d. It is contended, that there is no proof that the larceny was committed in Tennessee; that the goods, having been taken from a steamboat in the Mississippi river, which is the dividing line between several States, may have been actually stolen in another State and brought into this; and the offence therefore not cognizable here.
To this objection two answers are given by the Attorney General. 1st. That, though the goods were stolen in another State, yet the bringing them to this State is a continuation of the original offence; that the possession having been acquired by fraud, is still illegal, and that in consequence thereof a felonious cepit et asportavit here. And, 2d. If this be not so, yet, as the proof shows that the goods were stolen; that the prisoner came on shore from the steamboat in this State with them in his possession; that they were stolen from the steamboat; and it not appearing that they were taken at a different place from the place of landing, and out of the jurisdiction of the State, the legal presumption is, that they were taken in the State.
*459 We will examine these propositions in their order. 1st. Can a thief who steals goods in another State, and brings them into this, be indicted and punished in our courts?
This is á question of a very serious import in this country, embracing as it does a great number of sovereign and independent States, united together by a federal constitution for the protection and advancement of their common welfare; and its decision depends upon the-political position they occupy in relation to each other. If they are to be considered as sovereign and independent of each other; as being deprived of none of the attributes of sovereignty but such as they have voluntarily parted from and vested in the government of the United States; then, we think, there can be no power arising out of a general law, by which the tribunals of any one State can enquire by criminal proceedings into the manner in which the possession of property has been acquired in another; and this because there can be no general law upon the subject applicable to them; each State having the sole and unrestricted right to provide for itself such rule of action, and such punishment for its violation, as may be deemed best to comport with the welfare, peace, and harmony of that portion of society over which it presides.
But if, on the other hand, they are to be considered as mere municipal divisions of one great body politic, under one general head, occupying the same relation to each other that one county in England or one department in France does to an-other, there will be as little difficulty in assuming that the power does not exist. Which of these relations exists, we apprehend, cannot now be a matter of serious controversy. We hold it to be sovereign, and not to be municipal; that these States in their intercourse as such, are as sovereign and independent as are the different members of the Germanic confederation, or the cantons of Switzerland. This being so, a breach of the common law of our State is no more cognizable in another than would be a breach of the criminal law of Mexico, Texas, France, or England. From a want of the proper understanding of this our social position, some discrepancy has existed in the different States of the Union, in the application *460 of the principles of the common law to the subject now under consideration. ;jlt is well settled in England, that, by the common law, if a felon steal property in one county and carry it to another, he is guilty of larceny in that county, and may be there indicted and punished; and this is upon the ground that it is a continuing felony, and that the person is equally guilty in the one county or the other, the common law being supreme over each, and a'punishment in one a satisfaction for the offence in the other; but before it can be pronounced to be a continuing felony, the first taking must be adjudged to have been felonious, which would have been a work of supererogation, when that taking had been in a foreign and independent State; and that such was the opinion of common law lawyers of England, is most satisfactorily established by Butler’s case, 3d Institute 113.; That case was this:. Butler and other pirates, in summer vacation robbed divers of his majesty’s subjects upon the coast of Norfolk, upon the high seas, and brought divers of the goods taken into the county of Norfolk, and then were apprehended with the goods.
The question moved by Wray, Chief Justice, and Justice Perryman, Justices of Assize in Norfolk, was, whether they might be indicted for felony in Norfolk; as if one steals goods in one county and carries them into another, he may be indicted in either county; and it was resolved by them, that they could not be indicted for felony in Norfolk, because the original taking was no felony whereof the common law took cognizance; because it was done upon the sea out of reach of the common law, and therefore not like the case where one stealeth in one county and carries the goods into another; for the original act was felony whereof the common law took cognizance. There is no case, that we are aware of, in conflict with this decision. No case in which a larceny committed out of the realm of England, has been punished in the Courts of England, even though it were in Scotland or Ireland, previous to the passage of the statute of George III, chap. 31, which was enacted for the express purpose of giving the Courts of England cognizance of such offences, where the goods were stolen in *461 another part of the United Kingdom and brought into England, and vice versa.
This question has never been presented before for adjudication in this State; but it has in several of the other States. It was directly presented in North Carolina, in the case of the State vs. Brown, reported in 1st Haywood’s Rep., 100, in which it was held, after a careful and able examination by Judge Ash, that the stealing of a horse in the territory south of the Ohio, was not an offence punishable in North Carolina, though the horse was brought by the thief into that State. The same question was presented to the Supreme Court of New York, in the case of The People vs. Gardner, 2 Johnson’s Rep. 477, and received a similar determination. In that case, the prisoner had stolen a horse in Virginia, and fled into the State of New York, where he was apprehended with the horse in his possession; and. it was held that he could not be tried in that State for the felony, but was to be considered merely as a fugitive from justice. Subsequently, it was enacted by the revised statutes of New York, “that every person who shall feloniously steal the property of another, in any State or county, and shall bring the same into this State, may be convicted and punished in the same manner as if such larceny were committed in that State, and that in every such case, such larceny may be charged to have been committed in any town or city into which the stolen property may have been brought.” This is a municipal regulation of that State, obligatory upon her tribunals; and of course under it a different decision from that of Gardner’s case has been made; as was done, in the case of The People vs. Burke, 11 Wendell, 129. The same question has also been presented to the Courts of Massachusetts, and received a decision directly the reverse of that given in North Carolina and New York. As this opinion is also at war with the opinion to which this court has arrived upon the same subject, we will examine it, and test it upon principle and authority.
The question arose in the case of The Commonwealth vs. Thomas Anderson, and is reported in 2d Mass. Rep. 14. The prisoner was indicted for receiving goods which had been sto *462 len in the State of New Hampshire, knowing them to have-been stolen. The case was very ably argued for the defence, and determined against the prisoner, upon the authority of two cases, which it appeared had been previously decided, upon the same point, in the same State, viz: that of Cullen and that of Paul Lord. The reasoning of the court in those cases, we are not in the possession of, and therefore can say nothing about them. But the court, in the case of Anderson, does not base its determination solely upon the authority of the previously adjudged cases, “Cullen and Lord,” but atteoipts to rest it upon principle, which we can examine.
Parker, J., says: I hold myself bound by the authority of Cullen’s case, and that of Paul Lord, unless I were convinced that those decisions were against law. If solemn and repeated determinations of this court are not tobe regarded, I know not how we are to govern ourselves. But upon principle, independent of these cases, it appears to me, that the common law doctrine respecting counties, may be extended by analogy to the cases of States, united as these are, under one general government.” And of the same opinion, and for the same reasons, was Thatcher, J., and Sedgewick, J. Now, it may have been right and proper that this court shouldJrave felt itself bound by the precedents referred to; but we cannot recognize the reasoning upon principle. There is no analogy by which the common law doctrine respecting counties can be extended to the cases of States. These States are not under one general government, in the sense that the counties of one State are. The general government of the United States has no power to act in and over the States, except by express grant and necessary implication; and its action is necessarily confined by the constitution to their limits. Not so with the States. Their exercise of sovereignty is limited, not granted; and it, therefore, may be extended to all subjects of local legislation, which they are not prohibited by these own Constitutions from acting upon, or the right of action upon which they have not transferred from themselves to the General Government.
The State authority is, therefore, sovereign over its counties; *463 a law passed by it, or adopted by it, is equally obligatory upon all, and may be enforced in all according to its provisions, being omnipotent and co-extensive with the limits of the State, but no further. So soon as this boundary is passed, another rule of action, based upon a different authority, the sovereign power of another State, springs into existence, exercising its control over a different section of country, unrestricted and uncontrolled by that of the other; and it being well settled that the criminal and penal laws of one independent State cannot be recognized and enforced in another, we cannot comprehend the analogy spoken of by Judge Parker. Sedgewick, Judge, in delivering his opinion in the same case, says, more emphatically than Parker, that he is satisfied that the conviction is right upon principle. He says, that the only reason which appears to have influenced the court in the case of Butler, before referred to in 3d Institute 113, was that the jurisdiction of another court’ of the same government had attached, previous to any crime having been committed of which that court had jurisdiction. But it does not determine that if goods had been stolen in another country and brought into England, the fraudulent possession there would not have been considered such a taking as to constitute a theft. ' Now with due deference, we think it does so determine, and that the reason for the decision of the case was not that the court of admiralty had j urisdiction. If that had been the reason, how easy to have said so; but no, the reason is given — “they could not be indicted for felony in Norfolk because the original taking was no felony, whereof the common law took cognizance.” Why? The answer is given: “because it was done upon the sea, out of the reach of the common law;” not because it was done within the reach of the admiralty law, as Sedgewick, Judge, says. Can it be possible that a stealing on the high seas, off the coast of England, should be held to be out of the reach of the common law, and the same stealing, if it had taken place in France, within it? Most assuredly not.
Independent of this incapacity of the municipal law of one country to take cognizance of criminal offences in another, which we hold to be well settled, so various are the.provisions *464 of different countries in creating and punishing criminal of-fences, that it may be said with much plausibility, that the power should exist. A taking of property under certain circumstances may be and is often declared by law to be a larceny in one Staté which is not a larceny in another. ' If under these circumstances property be taken in one State and carried to the other, how is the case to be treated? Take the case of obtaining goods by false pretences; it is larceny by the laws of Tennessee, but not by the law of Arkansas. Goods are thus obtained in Tennessee and carried by the thief across the Mississippi river into Arkansas. Can he be there tried and punished for the theft? If he be, it must be under the Tennessee statute, and not under any law obligatory in the State of Arkansas. The possession of the goods in Arkansas is not felonious, though it were so in Tennessee, because the Tennessee statute can have no obligatory force in Arkansas courts; and this absurdity is of necessity the result, if the principle contended for in the Massachusetts case be law. ;If the law upon the subject constitutes a larceny in two different States the same, and property be stolen in one and carried to another, the criminal may be punished in either. But if they be different, and the taking be a larceny by the law of the place where the property is, but not by the law of the place to which it is removed, he can only be punished at the place where it was taken. If it be no larceny by the law of the place to which it is removed, because the possession was not in its inception felonious, and cannot be made so by matter ex post facto, this would make it necessary, in all cases, to enquire whether, by the law of the State where the goods were taken, the possession was feloniously obtained. This will of necessity cast upon the judicial authorities of one State, the necessity of en-quiring into and expounding the criminal laws of another, and that with a view of inflicting punishment under them. This difficulty was felt by Judge Sedgewick, in the opinion now under consideration. He gets rid of it by saying, he does not know why it might not be done, if necessary, but that it is not necessary; in which we think he is mistaken, for the reasons given.
*465 Upon the whole, we think that the decisions of the Court of North Carolina and the Court of New York, previous to her revised statutes, have expounded the law upon this subject correctly; and hold that no indictment for larceny lies in the Courts of this State for property stolen in another, and brought by the thief into this, and that he is only to be criminally considered as a fugitive from justice.
But 2d. It is said that it does not appear that the property was stolen in Tennessee, and that in the ■ absence of proof to that effect, the presumption is that it was stolen, and of this opinion is the court. The proof shows that the steamboat landed at Jackson’s wood-yard, in the county of Lauderdale, State of Tennessee; that the prisoner came on shore with the goods in his possession, and that they were stolen goods; the legal presumption is that they were stolen at that point; and if the prisoner wished to evade a trial for the offence in the Tennessee Courts, it was incumbent upon him to have introduced the proof, showing that the--larceny was committed beyond the limits of this State, and that he had therefore been guilty of no violation of the criminal code. This he has not done.
We, therefore, affirm the judgment of the Circuit Court.